Manfred P. Muecke (SBN 222893)
**Manfred APC**
600 W Broadway Ste 700
San Diego CA 92101
Tel: (619) 550-4005
Fax: (619) 550-4006
mmuecke@manfredapc.com

*Attorney for Plaintiffs*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAUCHELLE LEYMAN, and MIGUEL HERNANDEZ, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>THE KROGER CO.,<br><br>Defendant. | **'24CV1001 W    VET**<br><br>**Class Action Complaint**<br><br>**Jury Trial Demanded** |

Rauchelle Leyman ("Plaintiff Leyman"), and Miguel Hernandez ("Plaintiff Hernandez") ("Plaintiffs"), through Counsel, allege upon information and belief, except for allegations about Plaintiffs, which are based on personal knowledge:

## I.    DEMAND FOR "REAL INGREDIENTS" WITHOUT ADDITIVES

1.    According to a food industry executive, "Consumers are reading product labels more closely, and we are seeing the effects of a simple food movement when it comes to ingredients."

2.    Consumer research company Mintel attributed this demand for "real ingredients" in part due to media attention focused on lack of transparency in the food

industry.[1]

3.     This sentiment is reflected in the public's growing aversion to additives.

4.     Additives refer to non-food ingredients created in laboratories to fulfill various functions, such as facilitating processing ("processing aids"), improving appearance ("colorants"), creating or enhancing taste ("flavorings") and extending shelf-life and slowing deterioration ("preservatives").

5.     According to one observer, "Our foods are laden with additives that are meant to enhance flavor, color and shelf life that research has shown are either bad for people to consume or inconclusively so." [2]

6.     A recent consumer survey by the International Food Information Council ("IFIC") found that almost thirty percent of the public consider additives in food a top concern.[3]

7.     This aversion to additives is based on the belief that chemicals of any kind are not necessarily safe and may pose health risks.[4]

8.     This behavior makes sense, as studies have confirmed negative health effects linked to foods laden with chemical additives.[5]

9.     A growing number of consumers seek foods marketed with components

---

[1] Lynn Dornblaser, Director, Innovation & Insight, Mintel, "*Clean Label: Why this Trend is Important Now*," 2017

[2] Frank Giustra, *You Might Be Surprised by What's in Your Food*, Modern Farmer, Feb. 8, 2021

[3] Tom Neltner, Environmental Defense Fund, Chemicals Policy Director, *Chemicals in Food Continue to be a Top Food Safety Concern Among Consumers*, Food Navigator, Sept. 20, 2021.

[4] Cary Funk et al., *Public Perspectives on Food Risks*, Pew Research Center, Nov. 19, 2018.

[5] Bhavana Kunkalikar, *Processed danger: Industrial food additives and the health risks to children*, News-Medical.net, May 23, 2023 (citing recent study in the Journal of the Academy of Nutrition and Dietetics, researchers explore the potential adverse health effects on children due to the use of industrial additives in processed food).

CLASS ACTION COMPLAINT
*Leyman et al. v. The Kroger Co.*

and ingredients indicated with the term, "100% _____ ," understanding this as consistent with its dictionary definitions of "completely" or "entirely," without anything else added, with respect to the substance following the "100%."[6]

10.    This is because shoppers feel more comfortable when foods they buy are like what they have in their refrigerators, instead of complex ingredients made in laboratories by chemists.

## II.    LEGAL BACKGROUND

11.    In response to an unregulated environment, where companies marketed their foods as containing the fruits and 100% fruit juice valued by consumers yet substituted ingredients of lesser economic and nutritive value, the Pure Food and Drug Act of 1906 established rules to protect the public.

12.    These requirements were strengthened by the Federal Food, Drug and Cosmetic Act ("FFDCA") in 1938, which sought to prohibit "misbranding" and economic adulteration with respect to the nation's food supply. 21 U.S.C. § 301 *et seq.*[7]

13.    This State adopted these laws through the Sherman Food, Drug, and Cosmetic Law ("Sherman Law"). Cal. Health & Safety Code ("HSC") § 109875, *et seq.*; HSC § 110100(a) (adopting federal regulations).

14.    Congress empowered the Food and Drug Administration ("FDA") to develop rules, "premised on the simple notion that consumers value 'the real thing' versus a close substitute and should be able to rely on the label to readily distinguish between the two."[8]

---

[6] Cambridge Dictionary, One Hundred Percent; Your Dictionary, One Hundred Percent

[7] "Misbranded" is the statutory term for labeling that is false and/or misleading, while "adulterated" means to "render (something) poorer in quality by adding another substance, typically an inferior one."

[8] Steven Steinborn, Hogan & Hartson LLP, *Regulations: Making Taste Claims*,

15.     Given that manufacturers of that era were using advanced scientific knowledge to substitute ingredients of lesser economic and nutritive value for the wholesome ingredients sought by the public, this was a daunting task.

16.     These principles were especially important for commonly consumed foods, for which "standards of identity" were established.

17.     These standards protected consumers, by ensuring a food's characteristics, ingredients, nutritive value, and production processes were consistent with what they expected.

18.     Since "consumers initially [] rely on extrinsic cues such as visual information on labels and packaging" to provide nutritive and sensory information, the labeling of such foods had to provide specific, complete, and truthful information, lest it be considered "misbranded."[9]

## III.   PRODUCT LABELING

19.     To appeal to the growing number of consumers seeking foods that "use 'real' ingredients, which is to say, those that are recognizable" and "naturally occurring," consisting of components entirely of those ingredients, and those they are familiar with consuming, instead of lesser valued substitutes and manufactured chemical compounds, The Kroger Co. ("Defendant") sells four packs of "Mixed Fruit

---

PreparedFoods.com, Aug. 11, 2006.

[9] Lancelot Miltgen et al., "*Communicating Sensory Attributes and Innovation through Food Product Labeling*," Journal of Food Products Marketing, 22.2 (2016): 219-239; Helena Blackmore et al., "*A Taste of Things to Come: The Effect of Extrinsic and Intrinsic Cues on Perceived Properties of Beer Mediated by Expectations*," Food Quality and Preference, 94 (2021): 104326; Okamoto and Ippeita, "*Extrinsic Information Influences Taste and Flavor Perception: A Review from Psychological and Neuroimaging Perspectives*," Seminars in Cell & Developmental Biology, 24.3, Academic Press, 2013;  Clement, J., *Visual Influence on In-Store Buying Decisions: An Eye-Track Experiment on the Visual Influence of Packaging Design*, Journal of Marketing Management, 23, 917-928 (2007); Gupta K, O. et al., Package Downsizing: Is it Ethical? 21 AI & Society 239-250 (2007).

CLASS ACTION COMPLAINT
*Leyman et al. v. The Kroger Co.*

In 100% Juice," with "In 100% Juice" appearing two times on the front label, in all capital letters, as the largest statement on the package, and again across the green ribbon which traverses the front label, in single-serving transparent cups, seemingly with the fruits contained in only "100% Juice" ("Product"), with a picture of a freshly picked peach, pineapple, and pear, and half a cup of these fruits cut up in what appears to be "100% Juice," across what appears to be a background of a wooden table, evocative of fresh and natural fruit and 100 percent fruit juice components, under the Kroger brand.[10]



20.     However, the fine print ingredients, on the bottom of the packaging, listed in order of predominance by weight, reveals purchasers do not receive only

---

[10] John Unrein, *Ingredients on Alert: How Consumer Demand is Influencing Baking's Future*, Bake Mag, Aug. 19, 2020 (discussion of ingredients applicable beyond context of baked goods).

"Mixed Fruit In 100% Juice," but mostly, or at least, a significant percentage, of undisclosed ingredients. 21 C.F.R. § 101.4(a).[11]



21. While the Product contains "Mixed Fruit" in the form of "Peaches,…Pears,…[and] Pineapple," the most significant non-fruit ingredient is not "100% juice" or any type of juice, but "Water," listed second.

22. The fourth and sixth ingredients are not "100% juice" and/or ingredients understood as "100% juice" by consumers, because they are "White Grape Juice Concentrate, [and] Lemon Juice Concentrate."

23. The seventh and eighth ingredients, "Ascorbic Acid (Vitamin C) To Protect Color, [and] Citric Acid," are neither fruits nor juices.

A. Added Water and Juice Concentrate

24. Though water is a natural component of the peaches, pears, pineapple, and 100 percent fruit juice, promoted on the front label, that the second ingredient is "Water" means that the Product likely has more water than all other ingredients except

---

[11] **INGREDIENTS:** PEACHES, WATER, PEARS, WHITE GRAPE JUICE CONCENTRATE, PINEAPPLE, LEMON JUICE CONCENTRATE, ASCORBIC ACID (VITAMIN C) TO PROTECT COLOR, CITRIC ACID.

peaches, and more water than any juice ingredient.

25.   One purpose of this significant amount of added water is to reduce the amount of peaches, pears, pineapple, and 100 percent fruit juice, that consumers receive, because water costs less than peaches, pears, pineapple, and 100 percent fruit juice.

26.   Water lacks the nutrients and taste of peaches, pears, pineapple, and 100 percent fruit juice.

27.   The added water is not from the peaches, pears, pineapple, or 100 percent fruit juice, but is added separately.

28.   Juice concentrate is made by steps which a consumer of "100% Fruit Juice" would not recognize or expect.

29.   This involves "100% Fruit Juice" that is steam heated in a vacuum to evaporate the water.

30.   The resulting slushy residue, or "juice concentrate," can now be stored for years, and shipped around the world.

31.   When the concentrate is eventually used, it is "reconstituted," but not through adding back water from any fruits but regular water.

32.   Finally, the juice concentrate undergoes heat pasteurization.

33.   According to Caroline West Passerrello, a registered dietitian nutritionist and a spokesperson for the Academy of Nutrition and Dietetics, making juice concentrate causes "100% Fruit Juice" to lose its volume, fiber, natural fruit flavors, and crucial, though heat sensitive nutrients like vitamin B and C, yet keep its sugar and calories.

34.   Vasanti Malik, a research scientist in the Department of Nutrition at the Harvard T.H. Chan School of Public Health, says that "people should view fruit concentrate as an added sugar, similar to high-fructose corn syrup."

35.   Reconstituted juice concentrates are recognized as lacking the sensory attributes of taste, odor, and aroma, of "100% Fruit Juice" that is not from

7

concentrate.[12]

36. Government experts reached similar conclusions, because "[C]oncentration via evaporation uses more drastic time-temperature conditions than pasteurization, creating considerable changes in flavor and sensory profiles of concentrated juices."[13]

37. The intense processing for juice concentrates requires that manufacturers "use additives like flavor packs, which are artificial compounds made from fruit byproducts," among other manufactured substances, to try and "restore" its "100% Fruit Juice" taste and qualities.[14]

38. According to one company which only uses "100% Fruit Juice," the quality of fruits used to make "juice concentrate" "doesn't really matter…Since it's all getting condensed," instead of having the same "high-quality as something you'd juice and use outright."[15]

39. Using juice concentrate is significantly less costly than using the peaches, pears, pineapple, and 100 percent fruit juice, promoted on the label, because water costs less than peaches, pears, pineapples, and 100 percent fruit juice.

B. Added Flavoring and Seasoning

40. While the Product's ingredient list does not disclose any added flavoring ingredients, i.e., "natural flavor," "good manufacturing practices" ("GMP") and

---

[12] Brunda et al., *Comparative Study of Not From Concentrate and Reconstituted From Concentrate of Pomegranate Juices on Nutritional and Sensory Profile*, Food Science and Technology International, 2022; 28(1):93-104 (describing "better antioxidant activity, iron bioavailability, anthocyanin content and sensory attributes were captured in pomegranate NFC juices over RFC juices.").

[13] U.S. International Trade Commission ("USITC"), *Lemon Juice From Brazil and South Africa*, Inv. Nos. 731-TA-1578-1579 (Final), Publication 5403, Feb. 2023 at 18.

[14] Lisa Wartenberg, MFA, RD, LD, *What Is Juice Concentrate, and Is It Healthy?*, Healthline.com, July 25, 2023.

[15] Spindrift, Real Fruit, Never From Concentrate.

relevant regulations permit companies to "add back" the volatile oils, essences, and other aromatic compounds, which are stripped from juice concentrates during steam evaporation, without disclosing this to consumers through the ingredient list or in a food's "statement of identity."

41.     In canned or packaged mixed fruit preparations, lemon juice is a widely recognized seasoning ingredient. 21 C.F.R. § 145.135(a)(1)(iii) and 21 C.F.R. § 145.135(a)(4)(i).

42.     The use of the "added back" volatile compounds for flavoring to the juice concentrates, and lemon juice concentrate for seasoning, means that consumers appear to receive only peaches, pineapples, pears, and 100% fruit juice, which may taste like only peaches, pineapples, pears, and 100% fruit juice, even though this is false.

C. Added Synthetic Preservatives

43.     Until the early twentieth century, ascorbic acid and citric acid were obtained from fruits, such as the peaches, pears, and pineapples, and 100 percent fruit juice, promoted on the Product's label.

44.     However, the ascorbic acid and citric acid used in the Product is not from peaches, pears, pineapples, or 100% fruit juice.

45.     Ascorbic acid is the synthetic version of vitamin C, obtained from genetically modified corn. 21 C.F.R. § 182.3013 ("Chemical Preservatives"); 7 C.F.R. § 205.605(b)(6) ("Synthetics allowed.").

46.     The glucose from the corn undergoes chemical reactions including hydrogenation, with synthetic substances, then is converted to sorbitol, before ascorbic acid is made.

47.     Like ascorbic acid, citric acid is "a major industrial chemical," "made from *Aspergillus niger* (aka: black mold)…that comes [usually] from sugar sourced

1  from genetically modified corn or beets."[16] 21 C.F.R. § 184.1033.

2      48.    Recovering citric acid requires numerous chemical reactions with

3  synthetic mineral salts and reagents.

4      49.    First, the filtrate is treated with lime solution or calcium carbonate.

5      50.    This chemical reaction forms tri-calcium citrate tetra hydrate, treated

6  with sulfuric acid in acidolysis reactors.

7      51.    Then, the solution is purified by passing through activated charcoal

8  columns and ion exchangers.

9      52.    Finally, it is evaporated to recover citric acid.

10      53.    The FDA, aware of consumer desire for foods without preservatives,

11  advised the public to check if a food's ingredients include the chemical additives of

12  "[A]scorbic acid [and] citric acid."[17]

13      54.    These ingredients are required to be followed by a description of their

14  function, so consumers can make informed choices, "e.g., 'preservative', 'to retard

15  spoilage', 'a mold inhibitor', 'to help protect flavor' or 'to promote color retention'."

16  21 C.F.R. § 101.22(j).[18]

17      55.    Ascorbic acid and citric acid are "chemicals that, when added to food,

18  tends to prevent or retard [their] deterioration." 21 C.F.R. § 101.22(a)(5).

19      56.    Ascorbic acid and citric acid function as preservatives in the Product

20  through their roles as acidulants, chelating agents, antimicrobial agents, buffering

21  agents, antioxidant additives, and/or anti-browning agents.

22      57.    As acidulants, ascorbic acid and citric acid increase the acidity of the

23  Product, which lowers its pH.

24

25  [16] Nelson, *What is Citric Acid, and is it Harmful to Your Health?*, Branch Basics, Nov.

26  11, 2020.

27  [17] Overview of Food Ingredients, Additives & Colors, Apr. 2010.

28  [18] The label complies in this respect for the designation of a function of ascorbic acid.

58.     This creates conditions which inhibit microbial spoilage from bacteria, yeasts, and molds.

59.     The addition of ascorbic acid and citric acid means that if any microorganisms survive processing and heat pasteurization, they will be neutralized, and the Product will be preserved by being stable and consumable for a longer period after it is first made, and after opened for consumption.

60.     As chelating agents, ascorbic acid and citric acid remove traces of heavy metals present in peaches, pineapples, pears, and/or 100% fruit juice.

61.     This prevents premature oxidation, which would degrade the Product's taste, color, and/or appearance.

62.     As antimicrobial agents, the low pH of ascorbic acid and citric acid helps to prevent microbial growth, thereby preventing spoilage and preserving freshness.

63.     As buffering agents, ascorbic acid and citric acid help to maintain a constant pH, preventing batch-to-batch inconsistencies in the Product.

64.     The result of the constant pH is that the Product lasts longer on the shelves and after being opened, because it will be more stable and less prone to microbial spoilage.

65.     As antioxidant additives, ascorbic acid and citric acid are oxygen scavengers and prevent oxidation, preventing rapid deterioration upon exposure to air or changes in storage conditions.

66.     As anti-browning agents, ascorbic acid and citric acid maintain the natural, light color of peaches, pears, pineapples, and/or 100% fruit juice, through preventing oxidation, allowing the Product to remain visually appealing longer than it otherwise would be.

67.     Beyond their preservative functions, ascorbic acid and citric acid are used in the Product to provide, and/or increase, its fruity and tangy taste.

68.     This is necessary, in part, because the highly processed juice concentrates, and/or mixed fruit lose some of their natural fruit flavor,

11

1  notwithstanding the likely addition of volatile essences, oils, and other compounds.

2     69.    The use of ascorbic acid and citric acid makes it appear to consumers

3  that the Product contains (1) more peaches, pears, pineapple, and 100% fruit juices,

4  and/or (2) higher quality ingredients, in terms of freshness, taste, and/or nutritive

5  value.

6     70.    By using ascorbic acid and citric acid, purchasers get a smaller amount

7  of peaches, pears, pineapple, and 100% fruit juice, than they otherwise would, and

8  promised by the front label.

9  **IV.   LABELING IS MISLEADING**

10     71.    The Product is "adulterated" and misleads consumers because a

11  "valuable constituent has been [] in part omitted or abstracted," since consumers

12  understand "100% Fruit Juice," in the context of buying a product labeled as, "Mixed

13  Fruit In 100% Juice," with "In 100% Juice" appearing two times on the front label, in

14  all capital letters, as the largest statement on the package, and again across the green

15  ribbon which traverses the front label, in single-serving transparent cups, seemingly

16  with the fruits contained in only "100% Juice," with a picture of a freshly picked

17  peach, pineapple, and pear, and half a cup of these fruits cut up in what appears to be

18  "100% Juice," across what appears to be a background of a wooden table, evocative

19  of fresh and natural fruit and 100 percent fruit juice components, to mean only fruit

20  juice, without water, juice concentrates, flavorings, such as captured and/or restored

21  volatile compounds and essential oils, seasonings, and/or synthetic preservatives,

22  even though they do not receive this. 21 U.S.C. § 342(b)(1); Cal. Health & Safety

23  Code § 110585(a).

24     72.    The Product is "adulterated" and misleads consumers because

25  "substance[s] ha[ve] been substituted wholly or in part [] for [100% Fruit Juice],"

26  including water, juice concentrates, flavorings, such as captured and/or restored

27  volatile compounds and essential oils, seasonings, and/or synthetic preservatives. 21

28  U.S.C. § 342(b)(2); Cal. Health & Safety Code § 110585(b).

73.   The Product is "adulterated" and misleads consumers because "inferiority has been concealed," through the addition of water, juice concentrates, flavorings, such as captured and/or restored volatile compounds and essential oils, seasonings, and/or synthetic preservatives, which are necessary, in part, because reconstituted juice concentrates are negatively impacted with respect to their nutritive, sensory, and/or organoleptic attributes, and such ingredients cause it to be of lower quality than juice which is not concentrated. 21 U.S.C. § 342(b)(3); Cal. Health & Safety Code § 110585(c).

74.   The Product is "adulterated" and misleads consumers because "substance[s] ha[ve] been added [] or mixed or packed therewith so as to increase its bulk or weight," which include water and juice concentrates. 21 U.S.C. § 342(b)(4); Cal. Health & Safety Code § 110585(d).

75.   The Product is "adulterated" and misleads consumers because "substance[s] ha[ve] been added [] or mixed or packed therewith so as to…make it appear better or of greater value than it is," which include flavorings, such as captured and/or restored volatile compounds and essential oils, seasonings, and/or synthetic preservatives, which improve its nutritive, sensory, and/or organoleptic attributes, so that purchasers buying peaches, pears, and pineapples, seemingly packed "In 100% Juice," will be unable to discern it is packed in mainly other, lesser valued ingredients. 21 U.S.C. § 342(b)(4); Cal. Health & Safety Code § 110585(d).

76.   The Product is "misbranded" and misleads consumers because "Mixed Fruit In 100% Juice," with "In 100% Juice" appearing two times on the front label, in all capital letters, as the largest statement on the package, and again across the green ribbon which traverses the front label, in single-serving transparent cups, seemingly with the fruits contained in only "100% Juice," with a picture of a freshly picked peach, pineapple, and pear, and half a cup of these fruits cut up in what appears to be "100% Juice," across what appears to be a background of a wooden table, evocative of fresh and natural fruit and 100 percent fruit juice components, causes them to

expect only peaches, pears, pineapples, and 100 percent fruit juice, when this is false and misleading, due to the presence of water, juice concentrates, flavorings, such as captured and/or restored volatile compounds and essential oils, seasonings, and/or synthetic preservatives. 21 U.S.C. § 343(a)(1); Cal. Health & Safety Code § 110660.

77.     The Product is "misbranded" and misleads consumers because "Mixed Fruit In 100% Juice," with "In 100% Juice" appearing two times on the front label, in all capital letters, as the largest statement on the package, and again across the green ribbon which traverses the front label, in single-serving transparent cups, seemingly with the fruits contained in only "100% Juice," with a picture of a freshly picked peach, pineapple, and pear, and half a cup of these fruits cut up in what appears to be "100% Juice," across what appears to be a background of a wooden table, evocative of fresh and natural fruit and 100 percent fruit juice components, causes them to expect only peaches, pears, pineapples, and 100 percent fruit juice, even though this "fails to reveal facts material in the light of such representations," because in place of peaches, pears, pineapples, and 100% fruit juice, it has substituted water, juice concentrates, flavorings, such as captured and/or restored volatile compounds and essential oils, seasoning, and/or synthetic preservatives. 21 U.S.C. § 343(a)(1); Cal. Health & Safety Code § 110660; 15 U.S.C. § 55(a)(1).

78.     Substituting water, juice concentrates, flavorings, such as captured and/or restored volatile compounds and essential oils, seasoning, and/or synthetic preservatives, for peaches, pears, pineapples, and 100% fruit juice, is of material interest to consumers, because peaches, pears, pineapples, and 100% fruit juice cost more than these lower quality alternatives.

79.     Substituting water, juice concentrates, flavorings, such as captured and/or restored volatile compounds and essential oils, seasonings, and/or synthetic preservatives, for peaches, pears, pineapples, and 100% fruit juice, is of material interest to consumers, because peaches, pears, pineapples, and 100% fruit juice contain more nutrients than these lower quality alternatives.

80.     Substituting water, juice concentrates, flavorings, such as captured and/or restored volatile compounds and essential oils, seasoning, and/or synthetic preservatives, for peaches, pears, pineapples, and 100% fruit juice, is of material interest to consumers, because peaches, pears, pineapples, and 100% fruit juice are natural ingredients made through simple processes, while juice concentrates, flavorings, such as captured and/or restored volatile compounds and essential oils, and/or synthetic preservatives, are made through industrial manufacturing, with the latter two created in laboratories.

81.     The Product is "misbranded" and misleads consumers because "Mixed Fruit In 100% Juice," with "In 100% Juice" appearing two times on the front label, in all capital letters, as the largest statement on the package, and again across the green ribbon which traverses the front label, in single-serving transparent cups, seemingly with the fruits contained in only "100% Juice," with a picture of a freshly picked peach, pineapple, and pear, and half a cup of these fruits cut up in what appears to be "100% Juice," across what appears to be a background of a wooden table, evocative of fresh and natural fruit and 100 percent fruit juice components, fails to prominently and conspicuously reveal facts relative to the proportions or absence of peaches, pears, pineapples, and/or 100% fruit juice. 21 U.S.C. § 343(a)(1); Cal. Health & Safety Code § 110660.

82.     This is because it fails to disclose that it contains mostly, or at least, a significant percentage, of other ingredients, including water, juice concentrates, flavorings, such as captured and/or restored volatile compounds and essential oils, seasonings, and/or synthetic preservatives, besides peaches, pears, pineapples, and/or 100% fruit juice.

83.     The Product is "misbranded" and misleading because the name of "Mixed Fruit In 100% Juice," with "In 100% Juice" appearing two times on the front label, in all capital letters, as the largest statement on the package, and again across the green ribbon which traverses the front label, in single-serving transparent cups,

seemingly with the fruits contained in only "100% Juice," with a picture of a freshly picked peach, pineapple, and pear, and half a cup of these fruits cut up in what appears to be "100% Juice," across what appears to be a background of a wooden table, evocative of fresh and natural fruit and 100 percent fruit juice components, includes or suggests the ingredients of peaches, pears, pineapples, and/or 100% fruit juice, but does not include water, juice concentrates, flavorings, such as captured and/or restored volatile compounds and essential oils, seasonings, and/or synthetic preservatives, even though these are identified on the ingredient list in fine print on the bottom of the package. 21 U.S.C. § 343(a)(1); Cal. Health & Safety Code § 110660; 21 C.F.R. § 101.18(b).[19]

84.    The Product is "misbranded" and misleads consumers because "it purports to be or is represented as a food for which a definition and standard of identity has been prescribed," "Mixed Fruit In 100% Juice," with "In 100% Juice" appearing two times on the front label, in all capital letters, as the largest statement on the package, and again across the green ribbon which traverses the front label, but does not "conform[] to such definition and standard, [nor does] its label bear[] the name of the food specified in the definition and standard." 21 U.S.C. § 343(g); Cal. Health & Safety Code § 110710; 21 C.F.R. § 145.135.

85.    Since "Mixed Fruit In 100% Juice" is subject to the "Canned fruit cocktail," standard of identity, its labeling is required to conform to this standard. 21 C.F.R. § 145.135.

86.    The name of "Mixed Fruit" does not appear required to "include a declaration of any flavoring that characterizes the product as specified in [21 C.F.R.] § 101.22," because there is no apparent indication it uses "natural flavor" to simulate the taste of peaches, pears, and pineapples, though discovery may reveal this may

---

[19] The volatile compounds "added back" to the juice concentrates are not required to be disclosed in the ingredients.

have been added at some other point in the production process. 21 C.F.R. § 145.135(a)(4)(i).[20]

87.     The name of "Mixed Fruit" would not need to disclose any "added back" volatile compounds to the juice concentrates.

88.     Federal and state regulations require that because the Product is represented as "Mixed Fruit In 100% Juice," with "In 100% Juice" appearing two times on the front label, in all capital letters, as the largest statement on the package, and again across the green ribbon which traverses the front label, in single-serving transparent cups, seemingly with the fruits contained in only "100% Juice," with a picture of a freshly picked peach, pineapple, and pear, and half a cup of these fruits cut up in what appears to be "100% Juice," across what appears to be a background of a wooden table, evocative of fresh and natural fruit and 100 percent fruit juice components, yet uses seasoning in the form of lemon juice concentrate, "Mixed Fruit" "shall also include…a declaration of any [] seasoning that characterizes [it] for example, 'Seasoned with [lemon juice concentrate],'… [one] of the optional ingredients specified in [21 C.F.R. §§ 145.135(a)(1)(ii), (iii), (iv) and (v)]." 21 C.F.R. § 145.135(a)(4)(i).[21]

89.     Federal and state regulations require that "the name of the packing medium specified in [21 C.F.R. § 145.135(a)(3)(i)-(ii)], preceded by 'In' or 'Packed in'…shall be included as part of the name [of Mixed Fruit] or in close proximity to the name of [of Mixed Fruit]." 21 C.F.R. § 145.135(a)(4)(ii).

90.     Since "the liquid portion of the packing media provided for in [21 C.F.R.

---

[20] Even if "natural flavor" were added and listed in the ingredient list, Plaintiff would be unable to know, prior to discovery, the natural flavor composition, and whether its components cause it to have a greater effect on the peaches, pineapples, pears, or fruit juice components.

[21] Discovery may disclose that the lemon juice concentrate is used for purposes in addition to seasoning.

§ 145.135(a)(3)(i)-(ii)] consists of" "Water" and "Fruit juice(s)," this must be disclosed truthfully as part of the Product's name. 21 C.F.R. § 145.135(a)(4)(ii); 21 C.F.R. § 145.135(a)(3)(i)(c).

91.    Since the packing medium includes "White Grape Juice Concentrate" and "Lemon Juice Concentrate," which is "a combination of two or more fruit juices [both] of which are made from concentrate(s), the words 'from concentrate(s)' shall follow the word 'juices(s)' in the name of the packing medium," such as "In White Grape Juice From Concentrate and Lemon Juice From Concentrate," or "In Fruit Juice From Concentrate." 21 C.F.R. §§ 145.135(a)(4)(ii)(b)-(c).

92.    If "In Fruit Juice From Concentrate" was used to describe the packing medium, and "the names of the fruit juices used d[id] not appear in the name of the packing medium as provided in [21 C.F.R. § 145.135(a)(4)(ii)(b)], such names [of white grape juice and lemon juice] and the words 'from concentrate,' as specified in [21 C.F.R. § 145.135(a)(4)(ii)(c)], shall appear in [the Product's] ingredient statement," which they do. 21 C.F.R. § 145.135(a)(4)(iii).

93.    However, since "the liquid portion of the packing media provided for in [21 C.F.R. § 145.135(a)(3)(i)-(ii)] consists of" "Fruit juice(s) and water," this must be disclosed as part of the Product's name. 21 C.F.R. § 145.135(a)(4)(ii); 21 C.F.R. § 145.135(a)(3)(i)(b).

94.    Since the packing medium includes "Fruit juice(s) and water," a truthful and non-misleading description of the packing medium could be "In Water, White Grape Juice From Concentrate and Lemon Juice From Concentrate," or "In Water and Fruit Juice From Concentrate," with water listed before fruit juice from concentrate, because it is present in a greater amount. 21 C.F.R. § 145.135(a)(3)(i)(b); 21 C.F.R. § 145.135(a)(3)(ii) (model language for how added water should be disclosed as part of packing medium, but when it contains more fruit juice than water).

95.    The Product is "misbranded" and misleads consumers because the front label does not contain the "word[s], statement[s], or other information required," as

18

detailed above. 21 U.S.C. § 343(f); Cal. Health & Safety Code § 110705; 21 C.F.R. §§ 145.135(a)(4)(i)-(ii).

96. To the extent the ingredients other than peaches, pears, pineapples, and/or juice, appear on the bottom of the package's ingredient list, this does not "render [them] likely to be read and understood by the ordinary individual under customary conditions of purchase and use." 21 U.S.C. § 343(f); Cal. Health & Safety Code § 110705.

97. Instead of "Mixed Fruit," the "word[s], statement[s], or other information required" to describe the name of this food, preceding the packing medium, on the front label, was Mixed Fruit, Seasoned With Lemon Juice Concentrate. 21 C.F.R. § 145.135(a)(4)(i).

98. Instead of "In 100% Juice," appearing two times on the front label, in all capital letters, as the largest statement on the package, and again across the green ribbon which traverses the front label, the "word[s], statement[s], or other information required" to describe the packing medium, on the front label, were "In Water, White Grape Juice From Concentrate and Lemon Juice From Concentrate," or "In Water and Fruit Juice From Concentrate." 21 C.F.R. § 145.135(a)(4)(ii).

99. The Product is "misbranded" and misleads consumers because "it bears or contains [the] chemical preservative[s] [of ascorbic acid and citric acid] [and does not] bear[] labeling stating th[ese] fact[s]." 21 U.S.C. § 343(k); Cal. Health & Safety Code § 110740; 21 C.F.R. § 101.22(c).

100. First, even though the ingredient list discloses one function of ascorbic acid with respect to color, this does not "render such statement likely to be read by the ordinary person under customary conditions of purchase and use," because (1) most consumers do not read the fine print ingredients, and/or (2) it is not identified as a chemical preservative. 21 U.S.C. § 343(k); Cal. Health & Safety Code § 110740; 21 C.F.R. § 101.22(c).

101. Second, the ingredient list does not disclose any of the preservative

functions of citric acid, nor is it identified as a chemical preservative, in the ingredient list, or elsewhere, and therefore it is impossible for "[any] such statement likely to be read by the ordinary person under customary conditions of purchase and use." 21 U.S.C. § 343(k); Cal. Health & Safety Code § 110740; 21 C.F.R. § 101.22(c).

102.   As a result of the false and misleading representations and omissions, the Product is sold at a premium price, around $2.59 for four 4 oz cups, excluding tax and sales, higher than similar products, represented in a non-misleading way, and higher than it would be sold for absent the misleading representations and omissions.

## JURISDICTION

103.   Jurisdiction is based on the Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

104.   The aggregate amount in controversy exceeds $5 million, including any statutory or punitive damages, exclusive of interest and costs.

105.   Plaintiff Leyman is a citizen of California.

106.   Defendant is a citizen of Ohio based on its corporate formation.

107.   Defendant is a citizen of Ohio based on the location of its principal place of business.

108.   The class of persons Plaintiff Leyman seeks to represent includes persons who are citizens of a different state from which Defendant is a citizen.

109.   The Court has jurisdiction over Defendant because it transacts business within California and sells the Product to consumers within California from the approximately 183 Ralphs stores, 20 Foodsco stores, and 90 Food4less stores, in this State, and online, to citizens of this State.

110.   Defendant transacts business in California, through the sale of the Product to citizens of California from the approximately 183 Ralphs stores, 20 Foodsco stores, and 90 Food4less stores, in this State, and online, to citizens of this State.

111.   Defendant has committed tortious acts within this State through the

20

distribution and sale of the Product, which is misleading to consumers in this State.

112.   Defendant has committed tortious acts outside this State by labeling, representing and selling the Product in a manner which causes injury to consumers within this State by misleading them as to its contents, quantity, attributes, type, origins, amount and/or quality, by regularly doing or soliciting business, or engaging in other persistent courses of conduct to sell the Product to consumers in this State, and/or derives substantial revenue from the sale of the Product in this State.

113.   Defendant has committed tortious acts outside this State by labeling the Product in a manner which causes injury to consumers within this State by misleading them as to its contents, quantity, type, origins, amount and/or quality, through causing the Product to be distributed throughout this State, such that it expects or should reasonably expect such acts to have consequences in this State and derives substantial revenue from interstate or international commerce.

## VENUE

114.   Plaintiff Leyman resides in San Diego County.

115.   Venue is in this Court because a substantial or entire part of the events or omissions giving rise to Plaintiff Leyman's claims occurred in San Diego County.

116.   Venue is in this Court because Plaintiff Leyman's residence is in San Diego County.

117.   Plaintiff Leyman purchased, used, consumed, and/or applied the Product in reliance on the packaging, labeling, representations, comparisons, and/or omissions identified here, in San Diego County.

118.   Plaintiff Leyman first became aware the packaging, labeling, representations, and/or omissions, were false and misleading, in San Diego County.

## PARTIES

119.   Plaintiff Leyman is a citizen of San Diego County, California.

120.   Plaintiff Hernandez is a citizen of Los Angeles County, California.

121.   Defendant The Kroger Co. is an Ohio corporation with a principal place

21

of business in Ohio.

122.   Defendant operates approximately 183 Ralphs stores, 20 Foodsco stores, and 90 Food4less stores, in this State, and sells products from online, to citizens of this State

123.   While Kroger sells leading national brands of products, it also sells many products under one of its private label brands, Kroger.

124.   Private label products are made by third-party manufacturers and sold under the name of the retailer, or its sub-brands.

125.   Previously referred to as "generic" or "store brand," private label products have increased in quality, and often are superior to their national brand counterparts.

126.   Products under the Kroger brand have an industry-wide reputation for quality.

127.   In releasing products under the Kroger brand, Defendant's foremost criteria was to have high-quality products that were equal to or better than the national brands.

128.   Kroger gets national brands to produce its private label items due its loyal customer base and high standards.

129.   Private label products under the Kroger brand benefit by their association with consumers' appreciation for the Ralphs, Foodsco, and/or Food4less brands overall.

130.   That Kroger-branded products satisfy this high bar was or would be proven by focus groups, which rated or would rate them equal to or above their name brand equivalent.

131.   A survey by The Nielsen Co. "found nearly three out of four American consumers believe store brands [like Kroger] are good alternatives to national brands, and more than 60 percent consider them to be just as good."

132.   Private label products generate higher profits for retailers like Kroger,

22

because national brands spend significantly more on marketing, contributing to their higher prices.

133.   The development of private label items is a growth area for Kroger, as they select only top suppliers to develop and produce Kroger products.

134.   Plaintiffs are like most consumers who try to buy foods which (1) prominently represent they contain 100% of their promoted ingredients, i.e., "100% fruit juice," (2) contain the types of ingredients they are familiar with and will have at home, like fruits and 100% fruit juice, instead of lower quality ingredients, and/or (3) do not contain additives and/or highly processed ingredients, that are manufactured in laboratories.

135.   Plaintiffs are like most consumers and look to the front label of foods to see what they are buying and to learn basic information about it.

136.   Plaintiffs are like most consumers who try to avoid additives based on the belief that they are potentially harmful, not natural, and/or unhealthy.

137.   Plaintiffs understood "Mixed Fruit In 100% Juice," with "In 100% Juice" appearing two times on the front label, in all capital letters, as the largest statement on the package, and again across the green ribbon which traverses the front label, in single-serving transparent cups, seemingly with the fruits contained in only "100% Juice," with a picture of a freshly picked peach, pineapple, and pear, and half a cup of these fruits cut up in what appears to be "100% Juice," across what appears to be a background of a wooden table, evocative of fresh and natural fruit and 100 percent fruit juice components, to mean only peaches, pears, and pineapples, in only fruit juice, without water, juice concentrates, flavorings, such as captured and/or restored volatile compounds and essential oils, seasonings, and/or synthetic preservatives.

138.   Plaintiffs understood 100% fruit juice to mean only not from concentrate fruit juice, because in their experience, the use of juice concentrate is typically disclosed on a product's label.

139.   Plaintiffs read, saw, and relied on the packaging and labeling of "Mixed

23

Fruit In 100% Juice," with "In 100% Juice" appearing two times on the front label, in all capital letters, as the largest statement on the package, and again across the green ribbon which traverses the front label, in single-serving transparent cups, seemingly with the fruits contained in only "100% Juice," with a picture of a freshly picked peach, pineapple, and pear, and half a cup of these fruits cut up in what appears to be "100% Juice," across what appears to be a background of a wooden table, evocative of fresh and natural fruit and 100 percent fruit juice components.

140.   Plaintiffs bought the Product with the labeling and packaging identified here, "Mixed Fruit In 100% Juice," with "In 100% Juice" appearing two times on the front label, in all capital letters, as the largest statement on the package, and again across the green ribbon which traverses the front label, in single-serving transparent cups, seemingly with the fruits contained in only "100% Juice," with a picture of a freshly picked peach, pineapple, and pear, and half a cup of these fruits cut up in what appears to be "100% Juice," across what appears to be a background of a wooden table, evocative of fresh and natural fruit and 100 percent fruit juice components, at or around the above-referenced price.

141.   Plaintiffs purchased the Product between May 2020 and May 2024, at Ralphs, Foodsco, and/or Food4less stores, in this State.

142.   Plaintiffs did not expect that in addition to the pictured and visible peaches, pears, pineapples, and what appeared to be 100% fruit juice, the Product's main liquid ingredient would not be juice, but water.

143.   Plaintiffs did not expect the fruit juice used would be juice concentrate, from which the water was removed, along with nutrients and other attributes.

144.   Plaintiffs did not expect that in addition to peaches, pears, pineapples, and 100% fruit juice, the Product would contain additives, like flavorings, such as captured and/or restored volatile compounds and essential oils, and/or synthetic preservatives.

145.   Plaintiffs paid more for the Product than they would have, had they

24

known (1) it did not contain only peaches, pears, pineapples, and 100% fruit juice, because it had water, juice concentrates, flavorings, such as captured and/or restored volatile compounds and essential oils, seasonings, and/or synthetic preservatives, (2) the second most predominant ingredient was not fruit juice, but water, and/or (3) the juice was juice concentrate, as they would not have bought it or would have paid less.

146.   The Product was worth less than what Plaintiffs paid, and they would not have paid as much absent Defendant's false and misleading statements and omissions.

147.   Plaintiffs chose between Defendant's Product and products represented similarly, but which did not misrepresent their attributes, quality, type, features, and/or components.

148.   Plaintiffs intend to, seek to, and will purchase the Product again when they can do so with the assurance its representations are consistent with its attributes, features, quality, type, ingredients, quantity, and/or composition.

149.   Plaintiffs are unable to rely on the representations not only of this Product, but other similar products described as packed in 100% juice, because they are unsure whether those representations are truthful.

150.   If Defendant's labeling were to be truthful, Plaintiffs could rely on the labeling of other such products.

## **CLASS ALLEGATIONS**

151.   Plaintiffs seek to represent the following class:

> All persons in California who purchased the Product in California during the statutes of limitations for each cause of action alleged, expecting it to contain only peaches, pears, pineapple, and/or 100 percent fruit juice, instead of also containing water, juice concentrates, flavorings, such as captured and/or restored volatile compounds and essential oils, seasonings, and/or synthetic preservatives.

152.   Excluded from the Class are (a) Defendant, Defendant's board members, executive-level officers, members, attorneys, and immediate family members of any

of the foregoing persons; (b) governmental entities; (c) the Court, the Court's immediate family, and Court staff and (d) any person that timely and properly excludes himself or herself from the Class.

153.   Common questions of issues, law, and fact predominate and include whether Defendant's representations and omissions were and are misleading and if Plaintiffs and class members are entitled to damages.

154.   Plaintiffs' claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

155.   Plaintiffs are adequate representatives because their interests do not conflict with other members.

156.   No individual inquiry is necessary since the focus is only on Defendant's practices, and the class is definable and ascertainable.

157.   Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

158.   The class is sufficiently numerous, with over 100 members, because the Product has been sold throughout the State for several years with the representations, omissions, packaging, and/or labeling identified here, at approximately 183 Ralphs stores, 20 Foodsco stores, and 90 Food4less stores, in this State, and/or online, to citizens of this State.

159.   Plaintiffs' Counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

160.   Plaintiffs seek injunctive relief because the practices continue.

## CLAIMS FOR RELIEF
### FIRST CAUSE OF ACTION
Unfair Competition Law ("UCL")
Cal. Bus. & Prof. Code § 17200, *et seq.*

161.   To the extent required, Plaintiffs incorporate by reference paragraphs 1-

CLASS ACTION COMPLAINT
*Leyman et al. v. The Kroger Co.*

102.

162.   The purpose of the UCL is to protect consumers against unfair and deceptive practices.

163.   This includes making state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection.

164.   The UCL considers false advertising, unfair acts, and deceptive practices in the conduct of any trade or commerce to be unlawful.

165.   Violations of the UCL can be based on other laws and standards related to consumer deception.

166.   Violations of the UCL can be based on public policy, established through statutes, law, or regulations.

167.   Violations of the UCL can be based on the principles of the Federal Trade Commission Act ("FTC Act") and FTC decisions with respect to those principles.15 U.S.C. § 45 *et seq.*

168.   A UCL violation can occur whenever any rules promulgated pursuant to the FTC Act, 15 U.S.C. § 41 *et seq.*, are violated.

169.   A UCL violation can occur whenever the standards of unfairness and deception set forth and interpreted by the FTC or the federal courts relating to the FTC Act are violated.

170.   A UCL violation can occur whenever any law, statute, rule, regulation, or ordinance which proscribes unfair, deceptive, or unconscionable acts or practices is violated.

171.   In considering whether advertising is misleading in a material respect, the FTC Act recognizes that the effect of advertising includes not just representations made or suggested by words and images, "but also the extent to which [it] fails to reveal facts material in the light of such representations," including references to components, and likeness to other similar products, among other things. 15 U.S.C. § 55(a)(1).

172.   In considering whether the labeling and/or packaging of food and consumer products is misleading, it is required to consider not only representations made or suggested by packaging, statements, images, and/or design, but also the extent to which this fails to prominently and conspicuously reveal facts relative to (1) the proportions or absence of the item being bought, certain ingredients, components, features, and/or attributes, and/or (2) other facts concerning its quantity, attributes and/or characteristics, such as ingredients, quantity, size, amount, origin, type, and/or quality, which are of material interest to consumers.

173.   Defendant's false and deceptive representations and omissions with respect to the Product's contents, fill, ingredients, quality, and/or similarity to other products, that it consisted only of peaches, pears, pineapple, and 100 percent fruit juice, are material in that they are likely to influence consumer purchasing decisions.

174.   This is because consumers prefer foods with the wholesome, natural, nutritious, and/or recognizable ingredients, promoted on the Product's front label and visible, peaches, pears, pineapple, and 100 percent fruit juice, instead of having those ingredients replaced with water, juice concentrates, flavorings, such as captured and/or restored volatile compounds and essential oils, seasoning, and/or synthetic preservatives.

175.   The replacement of peaches, pears, pineapple, and 100 percent fruit juice, with water, juice concentrates, flavorings, such as captured and/or restored volatile compounds and essential oils, seasoning, and/or synthetic preservatives, is of material interest to consumers, because (1) the former ingredients cost more than the latter, (2) they seek to avoid lower quality ingredients, like water, juice concentrates, flavorings, such as captured and/or restored volatile compounds and essential oils, seasoning, and/or synthetic preservatives, without nutrients, (3) they seek to avoid highly processed ingredients, such as additives, manufactured in laboratories, for reasons related to health, safety, nutrition, and/or quality, and/or (4) they seek foods described with the term "100%" with respect to a valued component of the food, such

28

as fruit juice, expecting that component to describe the entirety of the food or ingredient connected with this figure, for reasons related to health, nutrition, taste, and/or quality.

176.   The Product could have included more peaches, pears, pineapple, and 100 percent fruit juice, but added water, juice concentrates, flavorings, such as captured and/or restored volatile compounds and essential oils, seasonings, and/or synthetic preservatives, because they cost less and/or substituted for the highlighted ingredients of peaches, pears, pineapple, and 100 percent fruit juice.

177.   The labeling of the Product violated the FTC Act and thereby violated the UCL because the representations, omissions, packaging, and/or labeling, "Mixed Fruit In 100% Juice," in single-serving transparent cups, across pictures of freshly picked peaches, pears, and pineapples, created the erroneous impression it contained only peaches, pears, pineapple, and 100 percent fruit juice, when this was false, because it contained mostly or a significant quantity of unexpected ingredients, including water, juice concentrates, flavorings, such as captured and/or restored volatile compounds and essential oils, seasoning, and/or synthetic preservatives.

178.   The labeling of the Product violates laws, statutes, rules and regulations which proscribe unfair, deceptive, immoral, and/or unconscionable acts or practices, intended to protect the public, thereby violating the UCL.

179.   The labeling of the Product violated the UCL because the representations, omissions, labeling, and packaging, "Mixed Fruit In 100% Juice," in single-serving transparent cups, across pictures of freshly picked peaches, pears, and pineapples, causes them to expect only peaches, pears, pineapples, and 100 percent fruit juice, when it did not contain only peaches, pears, pineapple, and 100 percent fruit juice, but also water, juice concentrates, flavorings, such as captured and/or restored volatile compounds and essential oils, seasoning, and/or synthetic preservatives, which was unfair and deceptive to consumers.

180.   The labeling of the Product violated the UCL because the

29

representations, omissions, packaging, and labeling of "Mixed Fruit In 100% Juice," in single-serving transparent cups, across pictures of freshly picked peaches, pears, and pineapples, even though it contained mostly unexpected ingredients, including water, juice concentrates, flavorings, such as captured and/or restored volatile compounds and essential oils, seasoning, and/or synthetic preservatives, was contrary to the Sherman Law, which adopted other laws and/or regulations.

| Federal | State |
|---|---|
| 21 U.S.C. § 342(b)(1) | HSC § 110585(a) |
| 21 U.S.C. § 342(b)(2) | HSC § 110585(b) |
| 21 U.S.C. § 342(b)(3) | HSC § 110585(c) |
| 21 U.S.C. § 342(b)(4) | HSC § 110585(d) |
| 21 U.S.C. § 343(a)(1) | HSC § 110660 |
| 21 U.S.C. § 343(f) | HSC § 110705 |
| 21 U.S.C. § 343(g) | HSC § 110710 |
| 21 U.S.C. § 343(k) | HSC § 110740 |
| 21 C.F.R. § 101.18(b) | |
| 21 C.F.R. § 101.22(c) | HSC § 110100(a) |
| 21 C.F.R. § 145.135(a)(4)(i) | |
| 21 C.F.R. § 145.135(a)(4)(ii) | |

181.   Plaintiffs believed the Product contained only peaches, pears, pineapple, and 100 percent fruit juice, even though it contained mostly or a significant amount of other ingredients, including water, juice concentrates, flavorings, such as captured and/or restored volatile compounds and essential oils, seasonings, and/or synthetic preservatives.

182.   Plaintiffs paid more for the Product and would not have paid as much if

they knew that it did not contain only peaches, pears, pineapple, and 100 percent fruit juice, because it contained mostly or a significant amount of other ingredients, including water, juice concentrates, flavorings, such as captured and/or restored volatile compounds and essential oils, seasonings, and/or synthetic preservatives.

183.   Plaintiffs seek to recover for economic injury, financial damages and/or economic loss they sustained based on the misleading labeling and packaging of the Product, a deceptive practice under the UCL.

184.   Defendant's conduct is "unlawful" under the UCL because it violates the False Advertising Law ("FAL"), BPC § 17500, *et seq.* ("FAL"), and Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, *et seq.*

185.   Each of the challenged statements and omissions violates the FFDCA, Sherman Law, and/or FAL, and therefore violates the "unlawful" prong of the UCL.

186.   Plaintiffs will produce evidence showing how they and consumers paid more than they would have paid for the Product, relying on Defendant's representations, omissions, packaging, and/or labeling, using statistical and economic analyses, hedonic regression, hedonic pricing, conjoint analysis, and other advanced methodologies.

187.   As a result of Defendant's misrepresentations and omissions, Plaintiffs were injured and suffered economic and financial damages by payment of a price premium for the Product, which is the difference between what they paid based on its labeling, packaging, representations, statements, omissions, comparisons, and/or marketing, and how much it would have been sold for without the misleading labeling, packaging, representations, statements, omissions, comparisons, and/or marketing, identified here.

188.   Each of the challenged statements and omissions violates the FFDCA, Sherman Law and FAL, and therefore violates the "unlawful" prong of the UCL.

189.   In accordance with Cal. Bus. & Prof. Code § 17203, Plaintiffs seek an order enjoining Defendant from continuing to conduct business through unlawful,

unfair, and/or fraudulent acts and practices, and to commence corrective advertising.

**SECOND CAUSE OF ACTION**
False Advertising Law ("FAL")
<u>Cal. Bus. & Prof. Code § 17500, *et seq.*</u>

190.   To the extent required, Plaintiffs incorporate by reference paragraphs 1-102.

191.   The FAL prohibits false and/or misleading representations and omissions.

192.   Defendant makes "false [and] misleading advertising claim[s]" by deceiving consumers that the Product consists only of fruit, packed in 100% juice, through "Mixed Fruit In 100% Juice," with "In 100% Juice" appearing two times on the front label, in all capital letters, as the largest statement on the package, and again across the green ribbon which traverses the front label, in single-serving transparent cups, seemingly with the fruits contained in only "100% Juice," with a picture of a freshly picked peach, pineapple, and pear, and half a cup of these fruits cut up in what appears to be "100% Juice," across what appears to be a background of a wooden table, evocative of fresh and natural fruit and 100 percent fruit juice components, even though it contained mostly, or at least, a significant percentage, of other ingredients, including water, juice concentrates, flavorings, such as captured and/or restored volatile compounds and essential oils, seasonings, and/or synthetic preservatives, besides peaches, pears, pineapples, and/or 100% fruit juice.

193.   In reliance on this false and misleading advertising, Plaintiffs purchased, used, applied, and/or consumed the Product, without knowledge it did not consist only of fruit, packed in 100% juice, and instead contained mostly, or at least, a significant percentage, of other ingredients, including water, juice concentrates, flavorings, such as captured and/or restored volatile compounds and essential oils, seasonings, and/or synthetic preservatives, besides peaches, pears, pineapples, and/or 100% fruit juice.

194.   Defendant knew or should have known that these representations,

32

omissions, and/or comparisons, were likely to deceive consumers.

195.   Plaintiffs seek injunctive and equitable relief, restitution, and an order for the disgorgement of the funds by which Defendant was unjustly enriched.

## THIRD CAUSE OF ACTION
Consumers Legal Remedies Act ("CLRA"),
Cal. Civ. Code § 1750, *et seq.*

196.   To the extent required, Plaintiffs incorporate by reference paragraphs 1-102.

197.   The CLRA prohibits deceptive practices in connection with the conduct of a business providing goods, property, or services, primarily for personal, family, or household purposes.

198.   Defendant's policies, acts, and practices were designed to, and did, result in Plaintiffs' purchase, consumption, application, and/or use of the Product, primarily for personal, family, or household purposes, and violated and continue to violate sections of the CLRA, including:

  a.   Civil Code § 1770(a)(5), because Defendant represented that the Product had characteristics, attributes, features, capabilities, uses, benefits, and qualities it did not have;

  b.   Civil Code § 1770(a)(9), because Defendant advertised the Product with an intent not to sell it as advertised; and

  c.   Civil Code § 1770(a)(16), because Defendant represented that the Product had been supplied in accordance with its previous representations, when it was not.

199.   Pursuant to Cal. Civ. Code § 1782(a), Plaintiffs have or will send a CLRA Notice to Defendant, concurrently with the filing of this action or shortly thereafter, which details and includes these violations of the CLRA, demand correction of these violations, and provide the opportunity to correct these business

practices.

200.   If Defendant does not correct these business practices, Plaintiffs will amend, or seek leave to amend the Complaint, to add claims for monetary relief, including restitution and actual damages under the CLRA, and injunctive relief, to enjoin the unlawful methods, acts and practices alleged, pursuant to Cal. Civ. Code § 1780.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment and relief as follows:

A.   Certification of the Class, designating Plaintiffs as representatives and Plaintiffs' Counsel as Counsel for the Class;

B.   A declaration that Defendant has committed the violations alleged;

C.   For injunctive relief the Court deems appropriate;

D.   For restitution and disgorgement pursuant to, without limitation, BPC § 17200, *et seq.*, and Cal Civ. Code § 1780, except for monetary damages under the CLRA;

E.   Compensatory damages, the amount to be determined at trial, except for monetary damages under the CLRA;

F.   For attorneys' fees, costs, and interest;

G.   For such further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all causes of action so triable.

Dated:   June 7, 2024

Respectfully submitted,

*/s/  Manfred P. Muecke*

Manfred P. Muecke (SBN 222893)
**Manfred APC**
600 W Broadway Ste 700
San Diego CA 92101

CLASS ACTION COMPLAINT
*Leyman et al. v. The Kroger Co.*

Tel: (619) 550-4005
Fax: (619) 550-4006
mmuecke@manfredapc.com

*Attorney for Plaintiffs*